UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

CLARENCE KENYON GOMERY,

      Debtor.

_____/

Case No. BT 14-02290
Chapter 13

## OPINION DENYING CONFIRMATION AND GRANTING TRUSTEE'S MOTION TO CONVERT CASE TO CHAPTER 7

Appearances:

Paul I. Bare, Esq., Traverse City, Michigan, and Frank E. Stanley, Esq., Grand Rapids, Michigan, attorneys for Clarence Kenyon Gomery, Debtor.

Christopher K. Cooke, Esq., Traverse City, Michigan, attorney for Fred A. Topous, Jr.

Susan Jill Rice, Esq., Traverse City, Michigan, attorney for Members Credit Union and Northwestern Bank.

Brett N. Rodgers, Esq., Grand Rapids, Michigan, Chapter 13 Trustee.

Michelle M. Wilson, Esq., Grand Rapids, Michigan, attorney for the United States Trustee.

I.      INTRODUCTION AND ISSUES PRESENTED.

Clarence Kenyon Gomery (the "Debtor"), filed a voluntary petition under chapter 13 of the Bankruptcy Code[1] on April 2, 2014. In the nine months the case has been pending, the Debtor has filed several proposed chapter 13 plans, each of which has drawn objections from Brett N. Rodgers, the Chapter 13 Trustee (the "Trustee"), or Fred A.

---

[1]     The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive. Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

Topous, Jr. ("Topous"), the largest unsecured creditor in the case. During the pendency of the chapter 13 case, the Debtor was also arrested and charged with soliciting the murder of the attorney who represented Topous in prepetition state court litigation against the Debtor and in this bankruptcy case. The Debtor is currently incarcerated and awaiting trial on these criminal charges.

The Debtor now seeks confirmation of his Modified First Amended Chapter 13 Plan (the "Plan"). The Trustee and Topous have objected to the Plan on the grounds that the Plan is not feasible, § 1325(a)(6), and that neither the Plan nor the petition was filed in good faith under § 1325(a)(3) and (7). Pursuant to § 1307(c), the Trustee has also requested that the Debtor's case be converted to chapter 7 due to the Debtor's lack of good faith. Topous and the United States Trustee have concurred in this request. For the reasons that follow, the Court will deny confirmation of the Debtor's Plan and will convert this case to chapter 7.

## II.    JURISDICTION.

The Court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334. This bankruptcy case and all related proceedings have been referred to this Court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.). This contested matter is a core proceeding and this Court may enter a final order. 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate), (L) (confirmation of plans), and (O) (other proceedings affecting the liquidation of assets or the adjustment of the debtor-creditor . . . relationship). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### III.    FACTS AND PROCEDURAL HISTORY.

Evidentiary hearings on confirmation of the Debtor's proposed chapter 13 Plan and the Trustee's motion to dismiss or convert this bankruptcy case were held before this Court on August 28, 2014, November 24, 2014, and December 10, 2014.[2]   At the hearings, the Court heard testimony from five witnesses:  Detective Paul Gomez of the Grand Traverse County Sheriff's Department; the Debtor; the Debtor's wife, Aileen Gomery; the Debtor's accountant, Jerry Keelan; and Dale Fisher.  The Court found the testimony of Detective Gomez, Mr. Keelan, and Mr. Fisher to be credible, although portions of their testimony were only marginally relevant to the matters before the Court. The testimony of the Debtor was only partially credible.  In his testimony, the Debtor consistently claimed to have no knowledge about the details of his personal finances or the finances of his law firm, Gomery and Associates, PLLC.  He repeatedly refused to answer questions about specific transactions, instead referring them to his wife or sometimes his accountant, bookkeeper, or attorney.  (Tr. II at 40, 69, 72, 88-89, 90, 93, 93, 127, 141-43, 145, 147, 149-55, 159.)  The Court finds the Debtor's professed lack of knowledge surprising and implausible, particularly in light of the fact that he has been an attorney for twenty-five years and his representations that he reviewed all of the relevant financial information before certifying its accuracy in filings with this Court.  (Tr. II at 14, 16.)  Aileen Gomery was generally credible but also claimed to have limited knowledge

---

[2]      In this opinion, the exhibits admitted into evidence by Creditor Topous shall be cited as "Topous Exh. __;" and the Chapter 13 Trustee's exhibits shall be cited as "Tr. Exh. __."
         The transcript from the hearing on August 28, 2014, shall be cited as "Tr. I at __;" the transcript from the hearing on November 24, 2014, shall be cited as "Tr. II at __;" and the transcript from the hearing on December 10, 2014, shall be cited as "Tr. III at __."

of many financial details, particularly those involving the law firm and JACCK Enterprises, LLC.  On many issues, she shifted responsibility to the law firm's bookkeeper, who did not testify.  (Tr. III at 15-17, 21, 27, 33.)

The Court also admitted numerous exhibits into evidence at the hearings.  The following findings of fact are based on the documents filed in this case, the exhibits admitted at the hearings, and testimony of the various witnesses.

   A.   *The Pre-Bankruptcy State Court Litigation.*

Prior to the filing of the Debtor's bankruptcy case, Topous obtained a judgment against the Debtor and the Debtor's law firm, Gomery and Associates, PLLC, in the Circuit Court for the County of Grand Traverse, Michigan.  (Topous Exh. 1; Tr. II at 16; 22-23.) The state court litigation arose from the Debtor's representation of Topous in various business transactions, including the purchase of property referred to by the parties as the Old Mitchell Creek Golf Course, in Traverse City, Michigan.  In the state court litigation, Topous alleged that the Debtor drafted an Operating Agreement creating a limited liability company, T & G Real Estate Development, LLC ("T & G"), to purchase and hold the Mitchell Creek property.  Although Topous paid the full purchase price to acquire the property, Topous asserted that the Debtor breached his professional responsibilities and defrauded Topous in the transaction by surreptitiously giving himself a one half ownership interest in T & G in the Operating Agreement he drafted.  (Topous Exh. 4 at 4, 8-9; Tr. II at 65-66.)  After a trial in the state court, the jury awarded ownership of the Mitchell Creek

property to Topous and ordered the Debtor to pay Topous damages in the net amount of $11,622.22.[3]

After the judgment was entered, the Grand Traverse County Circuit Court also entered an Order Granting [Topous's] Motion for Sanctions for Frivolous Defense and for Spoliation of Evidence. (Topous Exh. 2.) A subsequent order imposed sanctions against the Debtor and his law firm, jointly and severally, in the total amount of $314,629.27. (Topous Exh. 3.)

The Debtor appealed the judgment and the sanctions order, but was unable to post the bond required to stay the state court judgment and order pending appeal. (Topous Exh. 5; Tr. II at 36-39.) The appeal was pending at the time the Debtor's bankruptcy case was filed, and a hearing on the motions for stay and the request for a bond was scheduled to be held in the state court on April 7, 2014. (Tr. II at 38.)

B. *The Filing of the Bankruptcy Case*.

When it became apparent that the Debtor would be unable to post the appellate bond required to stay collection of the Topous judgment and sanctions order, the Debtor filed for bankruptcy relief. (Tr. II at 11-13.) His voluntary chapter 13 petition was filed in this Court on April 2, 2014. (Dkt. No. 1.) The Debtor also filed a chapter 7 case on behalf of his law firm, Gomery and Associates, PLLC on April 2, 2014. (See Case No. 14-02289, Dkt. No. 1.) The Debtor filed his bankruptcy schedules and his Statement of Financial Affairs ("SOFA") with his Chapter 13 petition or shortly thereafter. (Dkt. No. 1 & 23.) The Debtor testified that his bankruptcy schedules were completed by his wife, Aileen

---

[3]     The judgment awarded Topous $25,000 in damages for a cash payment that was fraudulently obtained by the Debtor. This amount was offset by $13,377.38 in improvements the jury found that the Debtor had made to the Mitchell Creek Property. (Topous Exh. 1.)

Gomery, and his bankruptcy attorney. (Tr. II at 19.) The Debtor stated, however, that he had reviewed the schedules and SOFA, and signed them under penalty of perjury. (Tr. II at 14, 19, 42-43.) He testified repeatedly that the schedules were accurate. (Tr. II at 14, 19.)

Brett N. Rodgers was appointed as the Chapter 13 Trustee in the Debtor's case and a § 341 meeting was held on May 6, 2014.[4] (Dkt. No. 39.) The Debtor appeared at the § 341 meeting and testified, under oath, that he signed his bankruptcy petition, schedules, and SOFA, that he was familiar with the information contained in the documents, and that the information was true and correct.[5] (Topous Exh. 7 at 4; Tr. II at 50.)

The evidence presented at the hearings established that the Debtor's schedules and § 341 testimony failed to disclose a significant and valuable asset, JACCK Enterprises, LLC ("JACCK"), in which the Debtor had an interest. The Debtor's ownership interest in JACCK is not disclosed anywhere in his schedules or SOFA. The assets of JACCK consist of two commercial buildings located at 413 and 423 Eighth Street in Traverse City, Michigan. Ownership of these buildings was originally transferred by the Debtor and Aileen Gomery to JACCK via a quit claim deed dated April 15, 2004. (Tr. Exh. G.) According to a March 31, 2014, balance sheet admitted into evidence at the hearings, the book value of JACCK was $149,112.55. (Tr. Exh. A.) A reconstructed

---

[4] At the evidentiary hearing, the parties mistakenly stated that the § 341 meeting was held on May 5, 2014. (Tr. II at 16.) The court's docket shows that the meeting was actually held on May 6, 2014.

[5] A § 341 meeting was held in the Gomery and Associates chapter 7 case on May 28, 2014. The Debtor also testified under oath at that meeting that the information in the chapter 7 schedules and SOFA was true and accurate. (Tr. II at 76.)

balance sheet prepared by the Trustee's office estimated the fair market value of JACCK to be $241,939.31.  (Tr. Exh. B.)  At the § 341 meeting, the Debtor testified that JACCK was owned solely by his wife, Aileen Gomery.  (Topous Exh. 7 at 36-37.)  When questioned about tax returns that showed Debtor as having a fifty percent ownership interest in JACCK, the Debtor insisted the tax returns were filed in error.  (Id. at 37-38.)

The evidence presented at the hearings also raised serious questions about the accuracy of other disclosures on the Debtor's schedules.  For example, the only bank account disclosed on the Debtor's Schedule B is a "checking and savings account with Members Credit Union on which only the Debtor may draw."  (Dkt. No. 1.)  The balance of the account is listed as $19.00.  (Id.)  The Debtor's Schedule B also does not disclose that the Debtor owns any firearms, sports, or other hobby equipment.  (Dkt. No. 1.)

C. *The Debtor's Arrest and Incarceration.*

In July 2014, the Debtor was arrested and charged with solicitation of murder.  (Tr. I at 5.)  At the evidentiary hearings, Detective Gomez from the Grand Traverse County Sheriff's Department testified about the circumstances that led to the criminal charge, including a recorded conversation between the Debtor and Dale Fisher.  According to Detective Gomez, during the course of the recorded conversation, the Debtor offered Mr. Fisher $20,000 to kill Christopher K. Cooke, the attorney who represented Topous in both the state court litigation and the bankruptcy proceeding. (Tr. I at 5-6, 8.)  Detective Gomez also testified that the Debtor paid Mr. Fisher $1,000 during the recorded conversation, purportedly to purchase the weapon that would be used in committing the crime.  (Tr. I at 8-9.)

D. *Plan Confirmation and Motions to Dismiss or Convert*.

The Debtor's Original Chapter 13 Plan was filed on April 16, 2014. (Dkt. No. 25.) The plan proposed that the Debtor would make monthly plan payments of $465 per month, and that the total distribution to unsecured creditors would be $23,000. The Trustee objected to the plan on several grounds, including the Debtor's failure to disclose his ownership interest in JACCK, failure to commit all disposable income, and failure to provide requested information to the Trustee. (Dkt. No. 41.) These issues also caused the Trustee to file a motion to dismiss or convert the Debtor's chapter 13 case on June 30, 2014. (Dkt. No. 50.)

After the Debtor's arrest, the Trustee filed an Amended Objection to Confirmation of the Debtor's Plan. (Dkt. No. 56.) In addition to the objections previously raised, the Trustee's Amended Objection objected to the feasibility of the plan due to the fact that the Debtor was incarcerated and would be unable to make plan payments. The United States Trustee also filed a concurrence in the Trustee's motion to dismiss or convert the Debtor's case, arguing that conversion of the case would be most appropriate, given the Debtor's failure to disclose assets and provide documents to the Trustee. (Dkt. No. 63.)

On August 6, 2014, the Debtor filed a First Amended Chapter 13 Plan. (Dkt. No. 65.) The First Amended Plan proposed reducing payments to $100 per month, because the Debtor had been charged with a criminal offense and was "currently without wages or draws from his law practice." (Id.) The amended plan also acknowledged a "'fact issue" regarding Debtor's ownership interest in JACCK. (Id.) The Debtor proposed to address this issue by providing that, with the agreement of Aileen Gomery, one parcel of

real estate owned by JACCK would be sold, and one-half of the proceeds of the sale would be used to fund the Debtor's plan.

The Trustee and Northwestern Bank filed objections to confirmation of the First Amended Plan.  (Dkt. Nos. 73 & 80.)  The Trustee also filed an Amended Motion to Dismiss the Debtor's chapter 13 case.[6]  (Dkt. No. 78.)  Topous filed a concurrence with the Trustee's motion to dismiss.  (Dkt. No. 82.)  The Northwestern Bank objection was subsequently withdrawn.  (Dkt. No. 117.)

On August 26, 2014, the Debtor filed a Second Amended Chapter 13 Plan.  (Dkt. No. 81.)  In this amended plan, the Debtor asserted that only two unsecured claims, one held by Members Credit Union and one by Northwestern Bank, were timely filed.  The plan proposed to withdraw funds from the Debtor's exempt retirement plan to pay these claims in full.  The Second Amended Plan made no provision for the payment of the unsecured claims filed by Topous, one for $11,622.22, the net amount owed under the state court judgment, and the other for $314,629.27, the amount owed under the state court sanctions order, because the Debtor believed the claims were not timely filed.  The Second Amended Plan drew objections from Topous and the Trustee.  (Dkt. Nos. 98 & 113.)  The Debtor withdrew the Second Amended Plan after this Court entered an order allowing Topous's unsecured claims over the Debtor's objection.  (Dkt. No. 130.)

After withdrawing his Second Amended Plan, the Debtor filed a Notice of Modification of his First Amended Plan.  (Dkt. No. 135.)  The Modified First Amended Plan, which is the Plan currently before the Court, again states that the Debtor "was

---

[6]   Despite its title, the Trustee's Amended Motion to Dismiss actually requests that the Debtor's "case be converted to Chapter 7."  (Dkt. No. 78 at 2.)

charged with a criminal offense and is currently without wages or draws from his law practice." (Id.)  It provides that the Debtor "shall pay $100.00 per month until he is able to secure employment" and contemplates that the Debtor will "resume payments at a level which is consistent with the requirements of 11 U.S.C. § 1325" when the Debtor is able to obtain employment in the future.  (Id.)  The Plan further provides that the amount paid in to the Plan "shall not be less than the liquidation value" and that the unsecured creditors shall be paid their pro rata share of the amounts paid in by the Debtor, after deduction of administrative expenses.  (Id.)  Finally, the Plan provides that both parcels of real estate owned by JACCK will be sold, and one half of the proceeds will be turned over to the Trustee to be administered as part of the bankruptcy estate.  The Plan states that the Debtor has negotiated this resolution with his wife, Aileen Gomery, to settle the dispute over ownership of JACCK, although he continues to maintain that JACCK is "solely owned by his wife."  (Id.)

The Trustee did not file an additional objection to the Modified First Amended Plan. However, at the evidentiary hearings, the Trustee restated his prior concerns about the Debtor's lack of good faith and stood on his motion to dismiss or convert the case.  The United States Trustee also asked that the case be converted due to the Debtor's lack of good faith and objected to confirmation based on lack of good faith and feasibility.  Topous stood on his prior objections to the Debtor's proposed Plan and concurred in the request to convert to chapter 7, due to the Debtor's lack of good faith in filing his chapter 13 case.

E. *Evidence Regarding Good Faith and Plan Feasibility*.

As noted previously, many of the arguments regarding the Debtor's lack of good faith in filing his chapter 13 case and plan are based on his failure to fully disclose various

assets.   The evidence presented at the hearings establishes the following material omissions:

    1.  <u>JACCK Enterprises, LLC</u>.

The most troubling and clear cut omission is the Debtor's failure to disclose his ownership interest in JACCK.   The joint income tax returns of the Debtor and Aileen Gomery and the tax returns of JACCK from 2009 to 2013 were admitted into evidence at the hearings.   (Topous Exh. 11.)[7]   Each year, the taxes of JACCK were reported on Form 1065, U.S. Return of Partnership Income.[8]   (Topous Exh. 11; Tr. Exh. B, C and D.) Schedule B-1 to Form 1065 states that the Debtor and Aileen Gomery are each fifty percent partners in JACCK.   (Topous Exh. 11; Tr. Exh. B, C and D.)   Similarly, Schedule K-1 to Form 1065 shows the Debtor's share of the JACCK partnership profits, losses, and capital as fifty percent.   (Topous Exh. 11; Tr. Exh. B, C and D.)   The Debtor's individual income tax returns, Form 1040, identify JACCK as a partnership, and report the income or losses from JACCK as "Income or Loss from Partnerships and S Corporations" on Schedule E, Part II of the form.   (Topous Exh. 11; Tr. Exh. H.)

The accountant who prepared the Debtor's tax returns, Jerry Keelan, testified that he always reported income from JACCK as partnership income.   (Tr. III at 74.)   He also testified that the Debtor and Aileen Gomery were aware that the returns were being prepared in this manner.   (Topous Exh. 30; Tr. III at 74, 85.)   He explained that neither the Debtor nor Aileen Gomery objected to the returns listing them as equal owners of

---

[7]    Portions of the 2011, 2012 and 2013 tax returns were also admitted as Trustee's Exhs. B, C, D, and H.

[8]    The exhibits provided to the Court do not include copies of JACCK's Form 1065, Schedule B-1 from 2009.

JACCK until early in 2014.  (Tr. III at 75.)  The Debtor also admitted that the tax returns showed that he and Aileen were each a fifty percent owner of JACCK.  (Tr. II at 71.)

In addition to the tax returns, various other documents were admitted into evidence, showing that the Debtor held himself out to be a fifty percent member of JACCK.  (Topous Exh. 29.)  These documents included a Limited Liability Resolution to Borrow / Grant Collateral dated April 15, 2004, and executed by the Debtor as a "Member" of JACCK; a Promissory Note dated April 15, 2004, signed by the Debtor as a "Member of Jacck Enterprises, LLC;" and a Note Modification Agreement dated September 8, 2005, also signed by the Debtor as a "Member" of JACCK. (Id.; see also Tr. Exh. E and F.)

Despite all of this evidence, the Debtor and Aileen Gomery both testified repeatedly that it was their intention that JACCK be owned solely by Aileen.  (Tr. II at 54, 56, 70, 84, 127, 129, 150; Tr. III at 18-19.)  However, the Debtor did not produce a copy of the LLC's Operating Agreement or any other documentary evidence in support of the assertion that JACCK was owned only by Aileen Gomery.

2.  Bank Accounts and Law Firm Draws.

At the evidentiary hearings, evidence was presented showing that, during the thirty days prior to the filing of the Debtor's bankruptcy case, approximately $15,000 in draws were made from Gomery and Associates, PLLC's account at Northwestern Bank, and paid either to the Debtor directly or to third parties, for the Debtor's benefit.[9]  (Topous Exh. 14-C.)  These draws included a $6,000 check to Speaker Law Firm, the law firm

---

[9]    These draws included:  a $3,800 check to the Debtor on March 4, 2014; a $1,000 check to the Debtor on March 4, 2014; a $6,000 check to Speaker Law Firm on March 6, 2014; a $500 check to the Debtor on March 15, 2014; a $3,000 check to the Debtor on March 20, 2014; and a $870 check to LPL Financial for "retirement contributions" on March 20, 2014. (Topous Exh. 14-C at 56, 59, 60, 61, 63, 64.)

representing the Debtor and Gomery and Associates in the Topous appeal.  (Id. at 60; Tr. III at 29-30.)  Aileen Gomery testified that attorney Liisa Speaker was paid an additional $10,000 from Gomery and Associates' Visa account at PNC Bank on March 21, 2014. (Tr. III at 31.)  The Debtor testified that he had no specific knowledge of the draws from Gomery and Associates and claimed that all of these transfers were handled by Aileen Gomery.  (Tr. II at 151-59.)

The majority of the checks from the law firm directly to the Debtor, which total over $8,000, were deposited into a bank account at Members Credit Union.  (Topous Exh. 14-C; Tr. III at 34.)  Aileen Gomery testified that she was the principal holder of this account, but that the Debtor was a joint owner.  (Tr. III at 35.)  She stated the account had been a joint account for twenty-two years, and that the Debtor had always had "free access" to it.  (Tr. III at 36, 38.)  This account was not disclosed on the Debtor's schedules.  In fact, the only bank account disclosed on the Debtor's schedules was savings and checking account at Members Credit Union with a balance of $19.00 as of the petition date.  Bank statements admitted at the evidentiary hearings show that the disclosed account had a $10.77 balance in the month preceding the Debtor's bankruptcy filing.

The Court also notes that these sizeable payments to the Debtor or for his benefit were not adequately disclosed in the Gomery and Associates chapter 7 case.  The Debtor signed the Gomery and Associates petition, schedules, and SOFA on behalf of the PLLC, and he testified that he certified that the information contained in the documents was true and correct under penalty of perjury.[10]  (Tr. II at 43; see also Case No. 14-02289, Dkt.

---

[10]      At the evidentiary hearings, the Debtor was questioned about the Gomery and Associates petition and the disclosures he made on behalf of the PLLC in the chapter 7 SOFA.  (Tr. II at 42-49.)  Although a copy of the chapter 7 petition and SOFA were referenced at the hearings and were used to refresh the Debtor's recollection during his testimony, the chapter 7 petition and

No. 1, showing Debtor's signature on petition as "President" and "Sole owner of the PLLC.")  The Debtor also testified that the transfer of certain miscellaneous office items and furniture is disclosed on the chapter 7 SOFA under Question 10, but acknowledged that the prepetition cash transfers are not listed on the SOFA.  (Tr. II at 46-48.)  He confirmed that, in response to SOFA question 23 regarding "withdrawals or distributions credited or given to an insider, including compensation . . . during the one year immediately preceding the commencement of the case," he, acting on behalf of the PLLC, answered NONE.  (Tr. II at 47; Case No. 14-02289, Dkt. No. 1, SOFA question 23.)  The SOFA in the chapter 7 case also indicates that the only payments made to insiders in the one year preceding the commencement of the case were to the Debtor and his daughter, Julie Kramer.  (Case No. 14-02289, Dkt. No. 1)  The SOFA does not disclose the amounts of the transfers, but states that Quickbooks records shall be promptly provided to the chapter 7 trustee.  (Id., SOFA question 3c).  On December 3, 2014, after the Debtor was examined about the transfers at the evidentiary hearings in this case, Gomery and Associates amended its SOFA to disclose that:  "Clarence Gomery was an employee of

---

SOFA were not formally admitted into evidence. (Id.)  Notwithstanding, the Court may take judicial notice of the Gomery and Associates chapter 7 petition, schedules and SOFA. See Fed. R. Evid. 201; Matter of Holly's, Inc., 172 B.R. 545, 554 n.5 (Bankr. W.D. Mich. 1994) (citing Barry Russell, Bankruptcy Evidence Manual § 201.5 at 162 (1994-95 ed.)) (additional citations omitted) (a bankruptcy court may take judicial notice of its own records), aff'd, 178 B.R. 711 (W.D. Mich. 1995).  In so doing, the Court has considered the chapter 7 schedules and SOFA only for the purposes of establishing what disclosures were made, and not for the truth of other matters asserted therein. Compare, e.g., Jergens v. Ohio Dep't of Rehab. & Corr. Adult Parole Auth., 492 F. App'x 567, 569 (6th Cir. July 11, 2012) (unpublished opinion) (noting that courts are "certainly permitted to take judicial notice of court records and judicial proceedings under some circumstances, such as to confirm the fact of filing" but may not be permitted to "do so in order to discern the truth of the facts asserted within that filing") (citation omitted) with In re Earl, 140 B.R. 728, 731 n.2 (Bankr. N.D. Ind. 1992) (court may take judicial notice of both the filing and the contents of schedules and statements filed in prior or related bankruptcy cases; "the verified Schedules and Statements filed by a debtor are not just pleadings, motions or exhibits," they "are evidentiary admissions").

the Debtor and received compensation . . . . The amounts paid have been disclosed in the Debtor's records provided to the Chapter 7 Trustee." (Case No. 14-02289, Dkt. No. 65.)

3. .308 Rifle and Other Personal Property.

The Debtor's Schedules did not disclose that he owned any firearms. At a 2004 exam held on June 5, 2014, the Debtor testified that he owned a "30-06 deer rifle" and that any other guns were owned by his son. (Topous Exh. 10 at 81-82.) Dale Fisher testified at the evidentiary hearings that he had personally observed a .308 rifle on the gun rack in the Debtor's residence. (Tr. III at 100.) When the Debtor was questioned at the hearings about whether he owned a .308 rifle, he invoked his rights under the Fifth Amendment. (Tr. II at 107.)

4. Feasibility and Eligibility.

At the hearings, there was little direct evidence regarding the status of the criminal case against the Debtor and his prospects for future income. However, the representations made by counsel suggest that a trial has been scheduled in the criminal matter. Even if the Debtor is ultimately acquitted of the criminal charges, it is uncertain whether the Debtor will ever practice law again. Reference was made to a grievance that is pending against the Debtor with the State Bar of Michigan. (Tr. III at 149.) The Debtor's attorney also candidly acknowledged that it is unlikely that the Debtor will be able to practice law in the future. (Tr. III at 129.) No other evidence of the Debtor's future earning potential was presented.

IV.    <u>DISCUSSION</u>.

Despite the long procedural history of this case, including the multiple plan amendments proposed by the Debtor, the primary objections raised by the Trustee, the United States Trustee and Topous in opposition to confirmation of the Debtor's chapter 13 Plan and in support of dismissal or conversion of the Debtor's chapter 13 case have remained constant.  The objecting parties argue that the Debtor has shown a lack of good faith, both in the filing of his chapter 13 Plan, § 1325(a)(3), and in the filing of the chapter 13 case itself, § 1325(a)(7) and § 1307(c).  The various objections also assert that the Debtor's Modified First Amended Plan is not feasible, § 1325(a)(6), and that the Debtor's lack of regular income makes him ineligible for chapter 13 relief, § 109(e).  The Court will address each of these assertions.

A.  *Good Faith*.

"Chapter 13 relief is reserved for the 'honest but unfortunate debtor,'" and in chapter 13 cases, a debtor's good faith may be relevant in several respects.  <u>In re Alt</u>, 305 F.3d 413, 422 (6th Cir. 2002).  Section 1325(a), which governs confirmation of chapter 13 plans, requires that a debtor's chapter 13 plan be proposed in good faith.  11 U.S.C. § 1325(a)(3); <u>see</u> <u>Shaw v. Aurgroup Financial Credit Union</u>, 552 F.3d 447, 450 (6th Cir. 2009) (A bankruptcy court is required to confirm a debtor's proposed chapter 13 plan, "so long as it satisfies the provisions of 11 U.S.C. § 1325(a).")  Section 1325(a)(7), which was added to the statute by the BAPCPA amendments,[11] also conditions plan confirmation on the petition having been filed in good faith.  11 U.S.C. § 1325(a)(7).  In

---

[11]    "BAPCPA" refers to the amendments to the Bankruptcy Code made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23.  Most of the BAPCPA amendments became effective in bankruptcy cases filed on or after October 17, 2005.

the confirmation context, the chapter 13 debtor bears the burden of proof on both of these good faith requirements.  11 U.S.C. § 1325(a)(3) and (a)(7); see Hardin v. Caldwell (In re Caldwell), 895 F.2d 1123, 1126 (6th Cir. 1990).

Section 1307(c) also provides that a chapter 13 case may be converted or dismissed, "whichever is in the best interests of creditors and the estate," for "cause."  11 U.S.C. § 1307(c) (identifying eleven potential examples of "cause," including prejudicial delay by the debtor, failure to timely file a plan, failure to commence making payments under § 1326, denial of confirmation of a plan, and material default by the debtor under a confirmed plan.)  The Sixth Circuit Court of Appeals has held that "cause" for dismissal or conversion may also exist if the debtor lacked good faith in the filing of the chapter 13 case.  In re Alt, 305 F.3d at 418 (The reasons listed in § 1307(c) for dismissal or conversion are not exclusive; "there is abundant authority for the notion that a bankruptcy court has the power to dismiss a Chapter 13 petition upon a finding that the debtor did not bring it in good faith.").  For purposes of § 1307(c), "the burden of showing the debtor's lack of good faith is borne by the party seeking dismissal [or conversion]."  In re Alt, 305 F.3d at 420.

The concept of good faith under both § 1325(a) and § 1307(c) is an "amorphous notion" that is both flexible and fact-specific.  See In re Alt, 305 F.3d at 419; Metro Employees Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah), 836 F.2d 1030, 1032-33 (6th Cir. 1988).  The Sixth Circuit has previously identified twelve factors that the court may consider when assessing the "totality of circumstances" and determining whether a chapter 13 plan was filed in good faith under § 1325(a)(3).  Society Nat'l Bank v. Barrett (In re Barrett), 964 F.2d 588, 591 (6th Cir. 1992).  These factors, which include "the

sincerity with which the debtor has petitioned for relief under Chapter 13," the debtor's potential for future earning, the circumstances under which the debts were incurred, and the amount of payment offered by the debtor,[12] may also be relevant in the analysis of whether a chapter 13 case was filed in good faith.  In re Alt, 305 F.3d at 419.  Other circuits utilize similar factors when determining whether a chapter 13 petition was filed in good faith under § 1307(c).[13]  See In re Love, 957 F.2d 1350, 1357 (7th Cir. 1992) (To determine whether a chapter 13 case was filed in good faith, the court should consider the "totality of the circumstances" including "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.").

The factors that are relevant to the good faith determination under either § 1325 or § 1307(c) obviously overlap to some extent, and the "same policy" of protecting against "an abuse of the provisions, purpose or spirit" of chapter 13 is embodied in both

---

[12]      The full list of "non-exhaustive" factors identified by the Sixth Circuit includes:  "(1) the debtor's income; (2) the debtor's living expenses; (3) the debtor's attorney fees; (4) the expected duration of the Chapter 13 plan; (5) the sincerity with which the debtor has petitioned for relief under Chapter 13; (6) the debtor's potential for future earning; (7) any special circumstances the debtor may be subject to, such as unusually high medical expenses; (8) the frequency with which the debtor has sought relief before in bankruptcy; (9) the circumstances under which the debt was incurred; (10) the amount of payment offered by [the] debtor as indicative of the debtor's sincerity to repay the debt; (11) the burden which administration would place on the trustee; (12) the statutorily-mandated policy that bankruptcy provisions be construed liberally in favor of the debtor."  In re Barrett, 964 F.2d at 592.

[13]      The Sixth Circuit Court of Appeals has not yet addressed the application of § 1325(a)(7), but at least one bankruptcy court within the Sixth Circuit has held that it is "appropriate to draw guidance from previous Sixth Circuit precedent addressing § 1307(c)" when analyzing § 1325(a)(7).  In re Hall, 346 B.R. 420, 426 (Bankr. W.D. Ky. 2006).

evaluations.  See In re Love, 957 F.2d at 1357; accord In re Condon, 358 B.R. 317, 325 (6th Cir. B.A.P. 2007) (discussing the good faith standards that apply when a debtor seeks conversion from chapter 7 to chapter 13 and noting that while the tests under §1325(a) and §1307(c) are not entirely "coterminous," both are "designed to detect abuses of the provisions and spirit of chapter 13").  Underlying both inquiries is the absolute requirement that chapter 13 debtors be "honest, forthcoming, truthful, and frank" with the bankruptcy court, the Trustee, and the creditors.  See In re Alt, 305 F.3d at 421.  In exchange for bankruptcy relief, debtors have an affirmative duty to accurately disclose their assets and liabilities and to account for their financial transactions.  See, e.g., Stephenson v. Malloy, 700 F.3d 265, 267 n.2 (6th Cir. 2012) (stating, in the context of a judicial estoppel analysis, that a "debtor has an affirmative duty to disclose all of his assets to the bankruptcy court") (citing 11 U.S.C. § 521(a)(1)); In re Colvin, 288 B.R. 477, 480 (Bankr. E.D. Mich. 2003) (stating in a chapter 7 case for turnover of a tax refund that the "connection between the debtor's obligation to file complete and accurate schedules and the fair administration of the bankruptcy case is clear") (citations omitted).  In this case, the Debtor has failed to fulfill that obligation.

      1.   The Debtor's Interest in JACCK Enterprises, LLC.

The evidence is indisputable that the Debtor possessed an ownership interest in JACCK.  The Debtor's own individual tax returns for 2009 through 2013, along with the returns of JACCK itself, reflect his income from JACCK and show him as having a one half ownership interest in the LLC.  Several other documents admitted into evidence at the hearing also demonstrate that the Debtor held himself out as a half owner of JACCK and signed documents in that capacity.

In light of this evidence, the Debtor's testimony that JACCK is owned solely by his wife strains credulity.  The Debtor has been a practicing attorney for twenty-five years and certainly has more than a rudimentary understanding of business law.  For instance, in this matter, the Debtor testified about his formation of another limited liability corporation, T & G Real Estate Development, its operating agreement, and his understanding of the members of that entity.  Yet neither the Debtor nor Aileen Gomery offered any documentary evidence in support of their asserted belief that the Debtor had no interest in JACCK.  Even if he genuinely believed that he had no ownership interest in JACCK, the tax returns and other documents should have, at a minimum, caused the Debtor to disclose his potential interest as "disputed" on his bankruptcy schedules and SOFA.  Not listing the asset, and leaving the Trustee or a creditor to "catch" the omission upon their review of documents in the chapter 13 case is neither a sufficient nor acceptable means of disclosure.

Similarly, the Debtor's original chapter 13 plan did not include any provisions for the Debtor to account for his interest in JACCK for the benefit of his creditors.  Subsequent plan proposals called for one parcel of property owned by JACCK to be sold, and for one half of the proceeds to be used in the Debtor's chapter 13 case.  The Modified First Amended Plan now provides for both parcels of JACCK's property to be sold and states that Aileen Gomery has agreed that "to resolve the dispute" over ownership of the LLC, one half of the proceeds from the sale may be used to fund the Debtor's chapter 13 Plan.  Again, the Debtor and his wife have made these offers only after the omission of the Debtor's interest in JACCK was discovered and objected to by the Trustee and Topous. This is simply too little, too late.

2.   <u>Bank Account and Law Firm Draws</u>.

The evidence at the hearings established that the Debtor received over $8,000 in draws from his law firm, Gomery and Associates, LLC, during the thirty days preceding the filing of his bankruptcy case.  The Debtor disavowed any knowledge of these transfers.  Aileen Gomery testified that these funds were deposited into a joint bank account at Members Credit Union.  She explained that she was the principal owner of the account, but that the Debtor was a joint owner and had been for twenty-two years.  This testimony was uncontroverted; however, other than Aileen Gomery's testimony, no evidence was admitted to support her assertion that the account was jointly owned.  In the absence of such evidence, the Court cannot conclusively determine that the account was jointly owned by the Debtor.  If Aileen Gomery was correct that the Debtor is a joint owner of the account, the Debtor had an affirmative duty to disclose his interest in this joint account on his bankruptcy schedules.  He did not do so.  The non-disclosure of the bank account is further evidence of the Debtor's lack of good faith.  If the funds had been in the account at the time of the bankruptcy filing, they could have been a valuable asset to the bankruptcy estate.  If the funds were transferred, the transfers could be subject to avoidance and recovery for the benefit of creditors in the Debtor's chapter 13 case or the law firm's related chapter 7 case.  Even if Aileen Gomery was mistaken in her characterization of the Members Credit Union account as joint, the Debtor offered no explanation of why his income was deposited in a bank account he neither owned nor disclosed during the month preceding the filing of his bankruptcy case.

In addition to the transfers made directly to the Debtor, significant other payments were made to third parties – including the $16,000 paid to the attorney representing the

Debtor and Gomery and Associates in the Topous appeal – in the month prior to the bankruptcy filings. The Court has serious concerns as to whether these transfers were adequately disclosed in the Gomery and Associates, PLLC chapter 7 case. The original SOFA filed in the chapter 7 case identified the Debtor as an insider creditor who had received payments in the year preceding the bankruptcy filing, but did not disclose the amounts of these transfers. After the Debtor was questioned about the transfers at the evidentiary hearings, the chapter 7 SOFA was amended to reiterate that the Debtor had received compensation prepetition and that records had been provided to the chapter 7 trustee. Still, no details were provided to the Court. If the transfers to the Debtor were actually deposited in the Members Credit Union account, and that account was owned solely by Aileen Gomery, the transfers from Gomery and Associates, PLLC, to Aileen Gomery are not disclosed on the chapter 7 SOFA. Finally, to the extent the payments to the Speaker Law Firm and other third parties benefitted the Debtor, those payments are also not disclosed on the chapter 7 SOFA as withdrawals or distributions to an insider.

The Debtor testified that he had no knowledge of these transfers, yet he signed the Gomery and Associates petition, schedules, and SOFAs as President of the PLLC entity. The Debtor did not disclose an ownership interest in the bank account about which Aileen Gomery testified in his own bankruptcy schedules, yet he acknowledged in his testimony that no transfers to Aileen Gomery are disclosed in the chapter 7 SOFA under Question 10. He further acknowledged in his testimony that these transfers are not disclosed as withdrawals or distributions to an insider, under Question 23 or any other portion of the chapter 7 SOFA. Given the timing, amount, and purpose of these transfers, the Court finds that the Debtor's failure to adequately disclose the payments in his law

firm's chapter 7 case is further evidence that the Debtor has not been honest in his filings with this Court.  In the totality of circumstances, the Debtor's inadequate, inaccurate disclosures support a finding that the Debtor lacked good faith in filing his chapter 13 Plan and petition.

    3.  The .308 Rifle.

The Debtor's bankruptcy schedules do not disclose ownership of any firearms, sports or other hobby equipment.  At his § 341 meeting, the Debtor stated that he owned a hunting rifle, and Dale Fisher testified that he had personally observed a .308 rifle when visiting the Debtor's home.  When the Debtor was asked at the hearing if he owned a .308 firearm, the Debtor invoked his rights under the Fifth Amendment.  See U.S. Const. amend. V ("No person shall be . . . compelled in any criminal case to be a witness against himself . . . .")  The Court may draw a negative inference from the Debtor's refusal to answer this question.  Wazeter v. Michigan Nat'l Bank (In re Wazeter), 209 B.R. 222, 231 (W.D. Mich. 1997) (citing Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]")); General Motors v. Heraud (In re Heraud), 410 B.R. 569, 575 (Bankr. E.D. Mich. 2009).  While the omission of this asset, standing alone, is not sufficient to support a finding of lack of good faith, the failure to disclose the .308 rifle adds to the weight of evidence suggesting that the Debtor lacked good faith in filing his chapter 13 Plan and petition.[14]

---

[14]    At the hearings, Topous raised numerous other allegations and introduced evidence regarding personal property that was not disclosed or may have been undervalued in the Debtor's bankruptcy petition.  Because the Debtor is incarcerated and had limited ability to refute these allegations, the Court makes no conclusions as to these matters.

4. Other Considerations, Conclusion, and Appropriate Remedy.

Based on the totality of circumstances in this case, the Court concludes that the Debtor lacked good faith in filing his chapter 13 Plan and his chapter 13 petition. The Debtor sought bankruptcy relief when he was unable to obtain an appellate bond to stay collection of the Topous judgment and sanctions order, a large portion of which resulted from the Debtor's misconduct in the state court litigation. The Debtor's bankruptcy schedules were filed under penalty of perjury, yet they contained several material omissions and errors. The Debtor failed to disclose his one half interest in JACCK, despite unrefuted evidence that the Debtor held himself out, in tax returns and other documents, as an owner of the LLC. The Debtor also failed to disclose his ownership interest in the .308 rifle, and either his potential ownership interest the joint Members Credit Union bank account or, alternatively, the transfer of significant funds from his law firm to his wife's bank account in the thirty days prior to the bankruptcy cases. These fundamental omissions have impeded the chapter 13 case and the bankruptcy process. JACCK is an asset with significant value, and the Debtor's one half interest in the LLC should be used to pay creditors in this case. To the extent the Debtor was a joint owner of the undisclosed bank account, that account also has potential value to the estate and creditors. The Debtor's original plan did not propose to pay anything to the Trustee for creditors based on these assets. The Modified First Amended Plan now proposes liquidation of JACCK's assets and payment of one half of the proceeds to the Trustee. This offer has only come after multiple plan amendments and has been characterized by the Debtor as an accommodation by Aileen Gomery to stave off litigation by the Trustee, rather than a good faith concession by the Debtor that he has an ownership interest in

JACCK. Throughout this case, the Debtor has not been fair in his treatment of his creditors, and has not been forthright in his dealings with the Trustee, the creditors, and this Bankruptcy Court. Under the circumstances, the Debtor has not acted in good faith.

Having found that the plan and petition were not filed in good faith, the Court must next determine "if the appropriate remedy is dismissal [or conversion] under § 1307(c), or the less harsh remedy of denial of confirmation" under § 1325(a)(3) and (7). In re Hall, 346 B.R. at 426; see In re Alt, 305 F.3d at 420 (Due to "the more severe consequences, the law also recognizes that 'the bankruptcy court should be more reluctant to dismiss a petition under Section 1307(c) for lack of good faith than to reject a plan for lack of good faith under Section 1325(a).'") (quoting In re Love, 957 F.2d at 1356). Given the egregious nature of the Debtor's failure to disclose assets, his overall lack of veracity, and the totality of circumstances preceding and during the pendency of this case, the Court finds that conversion to chapter 7 is warranted. The record in this case includes proof of misrepresentations and omissions by the Debtor with regard to several assets, and allegations of failure to disclose or properly value numerous others. The Court believes that conversion to chapter 7, which will allow these matters to be investigated by a chapter 7 trustee, is in the best interests of creditors in this case.

B. *Feasibility and Eligibility*.

The objections raised by the parties as to the feasibility of the Debtor's proposed chapter 13 Plan and lack of eligibility for chapter 13 relief lend further support to the Court's conclusion that confirmation of the Debtor's Plan must be denied and that conversion to chapter 7 is appropriate. In addition to the good faith required for confirmation of a chapter 13 plan, § 1325(a)(6) requires that the debtor "be able to make

all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). Feasibility is a factual issue and the burden of demonstrating the feasibility of the proposed chapter 13 plan is on the Debtor. See First Nat'l Bank of Boston v. Fantasia (In re Fantasia), 211 B.R. 420, 423 (1st Cir. B.A.P. 1997) ("To satisfy feasibility, a debtor's plan must have a reasonable likelihood of success," that is, it must be "likely that the debtor will have the necessary resources to make all payments as directed by the plan.")

In this case, the Debtor has failed to establish that his proposed Plan is feasible. Although the Plan requires minimal monthly payments of $100, the Debtor has offered no evidence of how he will obtain the funds to make even these nominal payments. The undisputed evidence is that the Debtor has been incarcerated since July 2014; the Debtor presented no evidence demonstrating, or even suggesting, that he has any income at this time. Under these circumstances, the Debtor's Plan is not feasible. See In re Scott, 188 F.3d 509, 1999 WL 644380 at *1 (6th Cir. Aug. 13, 1999) (unpublished table decision) (bankruptcy court did not abuse its discretion when it denied confirmation of incarcerated debtor's chapter 13 plan; "without a credible basis to find that [the debtor] could pay the $100 per month that his plan required, the plan could not be confirmed."). Considering the uncertainty surrounding the pending criminal case and the Debtor's potential for obtaining employment, the Debtor's ability to propose a feasible plan in the future is in serious doubt.

The Debtor's incarceration and lack of income also raise concerns about the Debtor's eligibility to be a chapter 13 debtor. Under § 109(e), only individuals "with regular income" and debts totaling less than the statutorily-prescribed limits are eligible for chapter 13 relief. 11 U.S.C. § 109(e). The Bankruptcy Code defines an "individual with

regular income" as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title, other than a stockbroker or a commodity broker." 11 U.S.C. § 101(30).  "The test for regular income is not the type or source of income, but rather its regularity and stability." In re Lovell, 444 B.R. 367, 368 (Bankr. E.D. Mich. 2011) (citation omitted).   Applying this standard, courts "have found sufficient income in cases of support derived from 'welfare, pensions, investment income, self-employment and other regular sources.'"  Id. (quoting In re Antoine, 208 B.R. 17, 19 (Bankr. E.D.N.Y. 1997)).

Again, the Debtor has offered no explanation, let alone evidence, of the source of the funds he proposes to use to make the $100 monthly payments required under his proposed Plan.  The Debtor is currently incarcerated and has offered no evidence that he has any current income.  The Debtor's Plan also proposes increasing his payments in the future, if he is able to obtain employment.  However, there is no assurance that the Debtor will be able generate income in the future.  Even if the Debtor is acquitted of the criminal charges, the evidence before the Court suggests that his ability to resume his law practice will be limited.  In his closing argument at the evidentiary hearing, the Debtor's attorney admitted that it is unlikely that the Debtor will resume his legal practice in the future. Because the Debtor has no current income, and limited prospects for income in the future, the Court concludes that the Debtor is not eligible to be a debtor under chapter 13. Conversion of the Debtor's case to chapter 7 is warranted.

V.    CONCLUSION.

For the foregoing reasons, confirmation of the Debtor's Modified First Amended Plan is DENIED under § 1325(a)(3), (6), and (7).  Because the Debtor lacked good faith in filing his chapter 13 petition, the Trustee's Motion to Dismiss [or Convert] shall be GRANTED and the Debtor's chapter 13 case shall be converted to chapter 7.  A separate order shall be entered accordingly.

**IT IS SO ORDERED.**

**Dated January 28, 2015**



James W. Boyd
United States Bankruptcy Judge